**WATERTOWN EQUIPMENT COMPANY and Edward Moe, Jr., Appellant,**

v.

**NORWEST BANK WATERTOWN, N.A., formerly First National Bank of Watertown; Jerry Miller, Vice President of Norwest Bank Watertown, N.A.; Thomas Green, Attorney for Norwest Bank Watertown, N.A., Appellees.**

No. 86–5448.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1987.

Decided Oct. 8, 1987.

Rehearing and Rehearing En Banc Denied Dec. 23, 1987.

Thomas J. Nicholson, Sioux Falls, S.D., for appellant.

Lawrence L. Pierson, Sioux Falls, S.D., for appellees.

Before LAY, Chief Judge, HEANEY, Circuit Judge, and LARSON,* Senior District Judge.

HEANEY, Circuit Judge.

Appellants Watertown Equipment Company and Edward J. Moe bring this 42 U.S.C. § 1983 action against appellees Norwest Bank of Watertown, its vice president, Jerry Miller, and its attorney, Thomas Green. The appellants claim that the appellees violated their rights to procedural due process by attaching property of Watertown Equipment Company under a South Dakota attachment statute. The district court granted summary judgment for each appellee, holding that each had qualified immunity from liability. We reverse and remand.

## I. BACKGROUND.

Appellant Moe was the majority stockholder of three farm implement dealers, Watertown Equipment Company in Watertown, South Dakota, and two others in Dawson and Appleton, Minnesota. From 1976 to 1982, Norwest Bank of Watertown (then First National Bank of Watertown) extended a general line of credit to Watertown Equipment which was secured by an interest in Watertown Equipment's inventory and receivables. Moe also personally guaranteed most of the loans. Altogether, Watertown owed Norwest about $488,000 on the loans.

Beginning in 1978, Watertown Equipment had difficulties meeting its loan obligations. Norwest and Moe tried to work out the difficulties. Norwest helped Moe list for sale a plot of about 180 acres which Watertown Equipment owned to finish payment on a mortgage and to help reduce the amount owing on the loans.

In 1982, Watertown Equipment's financial state worsened. Norwest made frequent demands on Moe for payment, but Moe was only able to make several small payments in 1982. In the spring of 1982, Norwest required monthly and even weekly formal inventories at Watertown Equipment. By summer, Norwest decided to cut Watertown Equipment's line of credit. At

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

this time, Norwest also claims to have discovered equipment missing from the dealership. According to Norwest, the manager of Watertown Equipment, Dan Toben, also warned Norwest that some of the collateral was going to be moved out of the state. In his affidavit, however, Toben stated that he never told this to Norwest, and, in fact, he said that Watertown Equipment had often moved equipment to one of Moe's other dealers and that its behavior in the six months prior to the attachment was no different than it had been in the past. Moe stated that Norwest was aware of such transfers in the past.

Norwest's vice president, Jerry Miller, claims that Norwest began to consider prejudgment attachment upon the suggestion of its attorney, Thomas Green, because of the movement of equipment out of the state and possible concealment of proceeds from sales. In early October of 1982, Miller more fully discussed the use of prejudgment attachment proceedings with Green. In a letter of October 25, 1982, Green cautioned that the South Dakota attachment statute in effect at that time [1] might be unconstitutional, although his research of the case law construing attachment statutes in other states led him to the conclusion that the South Dakota law was "distinguishable." Miller discussed the matter with Norwest's Discount Committee which decided to undertake the attachment. Green prepared the necessary papers, and, on October 25, 1982, Norwest secured an order from the clerk of court of Codington County. Pursuant to the writ of attachment, the sheriff arrived at Watertown Equipment, told all the employees to leave, and secured the building and all the equipment in it by changing the locks. After several months while the business was still under the attachment, Norwest and Watertown Equipment reached a settlement agreement. Watertown Equipment apparently was closed as a result.

The appellants instituted this action and pendent state claims in federal district court. On November 27, 1985, the district

court granted summary judgment for appellee Green. On October 6, 1986, the district court granted partial summary judgment for appellees Norwest Bank and Miller on the section 1983 claim and dismissed the state claims without prejudice.

## II. DISCUSSION.

This appeal presents three issues: whether qualified immunity generally protects the appellees from liability in this case; whether Norwest's and Miller's reliance on Green's advice as an attorney insulates them from liability; and whether Green's participation in the attachment was sufficient to be under color of state law.

Initially, it should be pointed out that an action under 42 U.S.C. § 1983 lies when a plaintiff establishes that a defendant acting under color of state law has deprived the plaintiff of a right secured by the Constitution or federal law. *See Buller v. Buechler*, 706 F.2d 844, 846–47 (8th Cir.1983) (citing *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978)). The right allegedly deprived in this case is the right to due process of law guaranteed by the fourteenth amendment. The action under color of law is present because private parties acting pursuant to state attachment statutes such as this one have been held to act under color of state law. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

### A. Qualified Immunity Under Attachment Statute.

In a suit under section 1983, a public official performing a discretionary function has qualified immunity from liability. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The protection of qualified immunity has been extended by this Court to private individuals who act in joint participation with public officials acting pursuant to creditor remedies statutes. In *Buller v. Buechler*, 706 F.2d at 850, we held that private individuals acting pursuant to a North Dakota garnish-

---

1. In 1983, the South Dakota Legislature repealed S.D. Codified Laws Ch. 21–17 and re-placed it. *See* Ch. 21–17A (1987). The holding in this case only concerns Ch. 21–17.

ment statute were entitled to the same qualified immunity as public officials. Because we can find no substantive distinction between an action under the garnishment statute in *Buller* and under the attachment statute here, we hold that each appellee here is entitled to invoke the defense of qualified immunity.

To gain the protection of qualified immunity, the defendant must show that he or she did not violate clearly established law of which he or she knew or should have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 813–14, 102 S.Ct. 2727, 2735–36, 73 L.Ed.2d 396 (1982); *see also Arcoren v. Peters,* 829 F.2d 671, 673 (8th Cir.1987) (en banc). Law is not clearly established when there is a "legitimate" or "open" question as to the legality of conduct. *Mitchell,* 472 U.S. at 533–36, 105 S.Ct. at 2819–21, 86 L.Ed.2d at 430–31 & n. 12. The standard is generally an objective one, *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738, and presents a question of law which can usually be disposed of at the summary judgment stage. *Id.* The defendant bears the burden of proving that the law was not clearly established at the time the alleged violation occurred. *Id.* at 808, 102 S.Ct. at 2733.

■ As the following review of the case law confirms, on October 25, 1982, the law clearly established the unconstitutionality of the South Dakota statute. Four Supreme Court cases have shaped the contours of the constitutionality of creditor remedies statutes. In *Sniadach v. Family Finance Corp. of Bay View,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), the Supreme Court declared that a Wisconsin prejudgment garnishment statute violated the "fundamental principles of due process" because it did not provide for notice and a hearing prior to the deprivation of wages. *Id.* at 342, 89 S.Ct. at 1823. A few years later in *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Supreme Court concluded that the Florida and Pennsylvania prejudgment replevin statutes, under which actions for repossession of a gas stove, stereo, bed, table, and other household goods occurred, violated due process. Moreover, the Court stated

that, absent extraordinary circumstances, before a debtor could be deprived of a significant property interest, he or she must be notified and given the opportunity to contest the creditor's claim. 407 U.S. at 82, 92 S.Ct. at 1995.

In *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), however, the Supreme Court upheld the constitutionality of a Louisiana sequestration statute even though it did not provide notice and a hearing before a refrigerator, a range, a stereo, and a washing machine were sequestered. The *Mitchell* decision emphasized that the creditor also had a property interest in the sequestered property and that, after weighing the competing interests of the creditor and the debtor, the procedural safeguards in the Louisiana statute provided the debtor sufficient due process after the deprivation. The procedural safeguards in the Louisiana statute were a factually detailed affidavit to be filed with the writ, the posting of an adequate creditor's bond, return of the property by the posting of a debtor's bond, an immediate post-deprivation hearing, creditor's liability for a wrongful attachment, and judicial supervision of the entire process. *Id.* at 608–10, 94 S.Ct. at 1900–01. The Supreme Court emphasized that the "requirements of due process of law 'are not technical,'" and that a court must consider a creditor remedy scheme "as a whole." *Id.* at 610, 94 S.Ct. at 1901.

Finally, in *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), the Supreme Court, relying on *Fuentes,* struck down a Georgia statute which permitted garnishment of a business's bank account without notice or a hearing. The procedural safeguards in the statute were insufficient because they did not provide for judicial supervision, a factually complete affidavit, or an early hearing. *Id.* at 607, 95 S.Ct. at 722.

This Court in 1975, in *Guzman v. Western State Bank of Devils Lake,* 516 F.2d 125 (8th Cir.1975), considered the attachment of a mobile home under North Dakota's attachment statute. In accordance

with the decision in *Mitchell,* we recognized that where the creditor has a legitimate interest in a prejudgment remedy, the necessary procedural safeguards in a given case are determined by

> comparing the extent to which they further the defendant's interest in avoiding a wrongful or arbitrary deprivation of his property with their negative effect upon the interest of the state in providing protective creditor remedies. If, on the balance, the potential for harm to the defendant under the state-adopted procedure is slight, in light of substantial advancement of a legitimate state interest in providing ex parte preliminary relief, the prejudgment procedure will be upheld as a "constitutional accommodation of the conflicting interests."

*Id.* at 128–29 (citing The Supreme Court, 1973 Term, 88 Harv.L.Rev. 41, 75 (1974)).

To determine whether the potential for harm to Watertown Equipment was indeed "slight," we must compare the procedural safeguards mandated by the Supreme Court with those provided by the South Dakota attachment statute. We agree with the appellees that the four Supreme Court decisions and our decisions such as *Guzman* point to five primary factors: (1) an affidavit accompanying the petition for the writ of attachment which contains facts alleged by a person with knowledge; (2) an opportunity for the debtor to dissolve the writ by posting a bond; (3) an "early" post-deprivation hearing at which the creditor bears the burden of proving the legality of the writ of attachment; (4) indemnification of the debtor for a wrongful attachment; and (5) judicial supervision of the attachment process.[2] In the end, however, the appellees must show that it was not clearly established on October 25, 1982, that the potential harm to Watertown Equipment under the South Dakota statute was more than "slight" in light of the "substantial advancement" of the state interest in protecting a creditor from a dissipation of collateral. The appellees contend that chapter 21–17 provided sufficient safeguards.

The South Dakota statute, as construed by the courts, did provide some of the safeguards mandated by the Constitution, such as requiring an affidavit setting out the "specific facts" in support of the claim. *See Mitchell,* 416 U.S. at 616, 94 S.Ct. at 1904. While the South Dakota statute did not on its face require the showing of "specific facts" in the affidavit, *see* S.D. Codified Laws Ann. § 21–17–3 (1979), it was interpreted by the South Dakota Supreme Court as requiring such a showing. *See Black Hills Mercantile Co. v. Bender,* 59 S.D. 241, 238 N.W. 883, 885 (1931) (interpreting section 2433 of the South Dakota Revised Code of 1919 which, in relevant part, is similar to section 21–17–3).

Although Norwest did not state specific facts in support of the attachment in its affidavit,[3] Watertown Equipment did not seek dissolution of the writ in state court on the basis of this omission. Because state law on this issue would have provided a sufficient remedy, we could not find a constitutional violation based to any extent on the insufficiency of the facts in the affidavit. *See Lugar,* 457 U.S. at 940, 102

---

**2.** These factors were also recognized in *Lewis Service Center, Inc. v. Mack Financial Corp.,* 696 F.2d 66, 68 (8th Cir.1982), a case decided on December 27, 1982, just a couple of months after the attachment in this case. The district court stated that "[h]ad the *Lewis* decision been on the books prior to the action in this case, it's the view of the Court that there * * * probably would be an issue of fact * * * whether * * * Defendant Green knew or should have known that * * * the attachment statute was unconstitutional." We believe that earlier cases such as *Guzman* and *Mitchell,* which both considered prejudgment attachment, are as or more instructive than *Lewis,* which considered a replevin action under a Nebraska statute.

**3.** Norwest set forth two grounds for the attachment in its affidavit: that Watertown Equipment "has secreted, encumbered, transferred and disposed of and may be about to secrete, encumber, transfer or otherwise dispose of property pledged as collateral to the Plaintiff with intent to defraud or delay this Plaintiff, as a creditor;" and that "the Defendant has removed a portion of the collateral and has attempted to remove additional portions of the collateral pledged as security for said loans from the State of South Dakota with intent to defraud or to delay this creditor."

S.Ct. at 2755 (private creditor's actions unlawful under state attachment law cannot be attributed to the "state" for the purposes of section 1983).

The appellees point to other safeguards in the South Dakota statute. *Mitchell* and *North Georgia Finishing* stress the importance of an "immediate" post-deprivation hearing wherein the creditor has the burden of proving the grounds upon which the writ was issued. *See Guzman,* 516 F.2d at 131. The South Dakota statute can be interpreted as having provided for an immediate hearing. Although the statute did not specify when a hearing must occur, its language was, in essence, no different on this point from the Louisiana sequestration statute which, in *Mitchell,* 416 U.S. at 606, 622, 94 S.Ct. at 1899, 1907, the Supreme Court said provided for an immediate post-deprivation hearing.

The appellees also point to the provision in the South Dakota statute which allowed the debtor to post a bond immediately after the attachment and regain possession of the property before a hearing. *See* section 21–17–26. *Mitchell* mentions this as one factor which could minimize the harshness of the prejudgment attachment. 416 U.S. at 608, 94 S.Ct. at 1900.[4]

These safeguards, however, do not make up for the lack of other crucial safeguards. First, the Supreme Court has required the active participation of a judge in approving the writ. As this Court said in *Guzman,* "[c]learly, the Court in *Mitchell* believed that the active participation of a judge, exercising judicial discretion whenever necessary, would aid in minimizing the likelihood of an improvident issuance of a writ

of sequestration." 516 F.2d at 131. Thus, in *Guzman,* this Court concluded that "*Mitchell* mandates that we review the North Dakota attachment law to determine if there is meaningful judicial supervision of the prejudgment attachment process." *Id.*

Here, as in *Guzman,* it is readily apparent that there was no meaningful supervision. The writ was obtainable from the clerk of court. *See* section 21–17–3.[5] No judge was to be involved in the matter unless a hearing was requested. *See* section 21–17–3. This falls far short of the Louisiana statute in *Mitchell* which provided "judicial control of the process from beginning to end." 416 U.S. at 616, 94 S.Ct. at 1904.

The appellees contend that in *North Georgia Finishing,* the Supreme Court retreated from requiring participation of a judge. As our Court in *Guzman* recognized, however, the intimations of the unimportance of judicial supervision come from the concurring and dissenting opinions. *See id.* at 611 n. 3, 95 S.Ct. at 725 n. 3 (Powell, J., concurring); *id.* at 619, 94 S.Ct. at 1906 (Blackmun, J., dissenting). We still are "compelled" to follow the opinion in *Mitchell.* 516 F.2d at 131 n. 7.

The Fifth Circuit has found a lack of judicial supervision fatal to the constitutionality of an attachment statute. *See Johnson v. American Credit Co. of Georgia,* 581 F.2d 526, 534 n. 16 (5th Cir.1978) (citing *Guzman,* 516 F.2d at 130 for the proposition that judicial supervision is necessary). While a lack of judicial supervision arguably may not have rendered the

---

**4.** It should be pointed out, however, that the requirements in posting a bond were much harsher for the debtor under the South Dakota statute than under the Louisiana sequestration statute discussed in *Mitchell.* The undertaking required of the debtor to regain possession of the attached property required execution by a "corporate surety or two resident freeholders of the state to be approved by the sheriff, conditioned that they will pay to the plaintiff on demand the amount of any judgment which the plaintiff may recover against the defendant in the action, with interest and costs." Section 21–17–26. Watertown Equipment would have had to post a bond for a debt of $488,000. The

Louisiana sequestration statute, on the other hand, only required that the debtor's bond "shall exceed by one-fourth the value of the property as determined by the court, or shall exceed by one-fourth the amount of the claim, whichever is the lesser." *Mitchell,* 416 U.S. at 607 n. 9, 94 S.Ct. at 1900 n. 9 (citing La.Code Civ.Proc.Ann. Art. 3508).

**5.** Section 21–17–3 provided that a "warrant of attachment may be obtained from the clerk of the court in which the action is brought upon filing the undertaking required in § 21–17–4, and an affidavit."

South Dakota attachment statute clearly unconstitutional in 1982 to a creditor in this Circuit, it does when combined with an additional defect: the bond in this case provided wholly inadequate indemnification of the debtor in case of a wrongful attachment. The Supreme Court has recognized that the creditor must post a bond and be liable for any damages resulting from a wrongful attachment. *Mitchell*, 416 U.S. at 610, 617, 618–19, 94 S.Ct. at 1901, 1905, 1905–06. The bond and full liability of the creditor serve two purposes. They deter an overzealous creditor from using attachment in the first place. *Id.* at 609–10, 94 S.Ct. at 1900–01. And, more importantly, they make the debtor whole if the attachment turns out to be wrongful. *Id.* at 617, 618, 619, 94 S.Ct. at 1905, 1905, 1906.

*Mitchell* clearly directs that not only must there be provision for payment to the defendant for damages, but also the payment must be sufficient. The Louisiana sequestration statute allowed damages for deprivation of the use of the sequestered property, humiliation, injury to reputation, and attorney's fees. *Id.* at 606 and n. 8, 94 S.Ct. at 1899 and n. 8. As the Supreme Court noted in its final paragraph summarizing why the Louisiana sequestration statute was constitutional, "the prevailing party is protected against *all* loss." 416 U.S. at 619, 94 S.Ct. at 1906 (emphasis added).

Even Justice Powell, who in his concurring opinion in *Mitchell* argued for the overruling of *Fuentes* because he believed that opinion swept too broadly, agreed that the creditor must at a minimum provide adequate security in the case of a wrongful attachment:

> In my view, the constitutional guarantee of procedural due process is fully satisfied in cases of this kind where state law requires, as a precondition to invoking the State's aid to sequester property of a defaulting debtor, *that the creditor furnish adequate security* and make a specific factual showing before a neutral officer or magistrate of probable cause

to believe that he is entitled to the relief requested. An opportunity for an adversary hearing must then be accorded promptly after sequestration.

*Id.* at 625, 94 S.Ct. at 1909 (emphasis added). *See also North Georgia Finishing*, 419 U.S. at 611 n. 3, 95 S.Ct. at 725 n. 3 (where Justice Powell states that a post-deprivation hearing "combined with the availability of the garnishor's bond to compensate for any harm caused * * * suffices to satisfy the requirements of procedural due process in this context").

A recent Eleventh Circuit case, *Jones v. Preuit & Mauldin*, 822 F.2d 998 (11th Cir. 1987), reinforces our conclusion about the centrality of indemnification of the debtor for all loss in the case of a wrongful attachment. The Eleventh Circuit did not find the Alabama attachment statute to violate clearly established law in 1982 because the statute required a factually specific affidavit, judicial supervision from "beginning to end," a creditor's bond, and an immediate post-deprivation hearing. Thus, the private creditors were entitled to qualified immunity.

The court noted, however, that one of the themes running through "all of the Supreme Court decisions" on creditor remedies, in addition to the need for an early post-deprivation hearing and judicial supervision, is that a debtor's "financial interest must be protected in the event of a wrongful prejudgment attachment, either via the posting of a bond by the creditor who seeks the writ, or by allowing an action for damages suffered as a result of a wrongful attachment." *Id.* at 1002. The debtor's "financial interest" in *Jones* was protected because the Alabama statute provided that in an action on the bond the debtor could recover "such damages as *he has actually sustained* if the attachment was wrongfully sued out." *Id.* at 1004 (quoting Ala. Code § 6–16–148 (1975)). (Emphasis added). Clearly, the centrality of an adequate bond for the protection of the debtor was well established by 1975.[6]

---

6. In *Lewis Service Center*, 696 F.2d at 66, in a replevin action, the creditor was not required to post a bond before obtaining a temporary order

requiring the defendant to hold the property "unimpaired and unencumbered" until a hearing was held. We reasoned that the absence of

The inadequacy of the bond in section 21–17–4 is clear. That section states that "in no case shall an undertaking [i.e., a bond or a guarantee] be required exceeding in amount the sum of ten thousand dollars." Furthermore, the South Dakota Supreme Court has determined that neither the common law nor the South Dakota attachment statute creates liability independent of the bond unless malice or lack of probable cause is shown. *See Slaughter v. Nolan*, 41 S.D. 134, 169 N.W. 232 (1918). Thus, the defendant is only protected from plaintiff's wrongful attachment for damages up to $10,000.

Norwest posted an undertaking in attachment which states that

FIRST NATIONAL BANK OF WATERTOWN, as Principal, of Watertown, South Dakota and Western Surety Company, as Surety, do undertake, promise and agree to and with the said Defendant that if the said Defendant recover Judgment, or if the Court shall finally decide that the Plaintiff was not entitled to an Attachment and that said Attachment be set aside by the Order of the Court, the Plaintiff shall and will pay all costs that may be awarded to the Defendant, and all damages which it may sustain by reason of issuing the attachment *not exceeding the sum of $10,000.00.* [Emphasis added.]

By Norwest's own estimate, the property which it attached had a fair market value of between $275,000 and $300,000.[7] Norwest maintained the attachment on the property of Watertown Equipment for several months. The attachment brought all

business at Watertown Equipment to a screeching halt. Clearly, even if Watertown Equipment had immediately requested a hearing to contest the attachment, the damages for loss of business and harm to reputation and for attorney's fees would easily have exceeded $10,000. In view of the facts of this case, it is readily apparent that the potential for harm to Watertown Equipment and Moe under the South Dakota attachment procedure was far from "slight." And this conclusion was readily apparent when the attachment occurred in 1982.

A comparison between the effect of an attachment under the South Dakota statute and the effect under the Louisiana sequestration statute as summarized in *Mitchell* further highlights the potential for harm in the South Dakota statute:

Here, the initial hardship to the debtor is limited, the seller has a strong interest, the process proceeds under judicial supervision and management, and the prevailing party is protected against all loss.

416 U.S. at 618–19, 94 S.Ct. at 1906.

In contrast, even if we assume a strong interest on the part of the creditor, the hardship to the debtor in this case was extensive—an entire business was closed—the process did not proceed under judicial management, and if the debtor would have prevailed in showing that the attachment was wrongful, it would have been unable to recover for any loss over $10,000. This procedure clearly was not constitutionally acceptable in 1982 when the attachment in this case occurred.

---

a bond was not a "fatal defect in view of the retention of possession by the debtor pending the provision of a prompt hearing." *Id.* at 69. Here, however, Watertown Equipment clearly had no access to its equipment or other property.

7. An exhibit submitted with the affidavit listed as property to be attached:
The following specific property:
71–706–IHC tractor w/F 10 Farmall Loader; 60 Case 930 Comfort King Tractor; 1977 Dodge Van; and 1975 Ford Pick-up
The Defendant's leasehold interest in that certain real property located in Codington County, South Dakota * * *

and
All debts, credits, money, bank notes, rights or shares which the Defendant may have in the Stock of any association or corporation, together with the interest and profits thereon; and
All shop equipment, inventory, office fixtures, other fixtures, office equipment, accounts receivable, contract rights, choses in action, tools, new parts, used parts, general intangibles, new farm machinery and equipment, used farm machinery and equipment, and all other property in the possession of or under the control of the Defendant.

## B. Advice of Attorney Green.

■ Appellees Norwest Bank and Jerry Miller claim that despite the fact that the law may have been clearly established, they should still be immune because they relied in good faith on the advice of their attorney. Although *Harlow* establishes an objective test—whether the law was clearly established—it does provide that in certain "extraordinary circumstances," the objective standard may not end the qualified immunity inquiry. *See* 457 U.S. at 819, 102 S.Ct. at 2738; *see also Barnett v. Housing Authority of City of Atlanta,* 707 F.2d 1571, 1583 (11th Cir.1983). As two commentators have recognized, one possible extraordinary circumstance may be where the defendant seeks the advice of counsel before acting. *See* M. Schwartz & J. Kirklin, "Section 1983 Litigation: Claims, Defenses, and Fees" (1986). Courts have generally found that the advice of an attorney may be a factor in shielding a defendant from liability under section 1983. *See Duchesne v. Sugarman,* 566 F.2d 817, 833 n. 32 (2d Cir.1977); *Tanner v. Hardy,* 764 F.2d 1024, 1027 (4th Cir.1985); *Crowe v. Lucas,* 595 F.2d 985, 992 (5th Cir.1979). This Court has also recognized that although reliance on the advice of counsel alone will not satisfy an official's burden of acting reasonably, it may be a factor which bears on the question of qualified immunity. *See Wentz v. Klecker,* 721 F.2d 244, 247 (8th Cir.1983).

We believe the facts in the *Tanner* and *Wentz* cases are instructive on this point. In *Tanner,* personnel at a facility for juvenile delinquents were holding a person who had been convicted of rape. A state court had to decide whether the individual could be legally held for a period longer than his sentence because he persisted in "aggravated anti-social or criminal behavior." 764 F.2d at 1025–26. The state court, however, did not timely decide the issue. Thus, the defendants were faced with a "perilous situation," whether to release a potentially dangerous person in their custody or face possible liability for unlawfully detaining him. *Id.* at 1026. The defendants consulted the Assistant Attorney General who apparently advised them not to release the

individual. The Fourth Circuit remanded the case to determine whether the defendants "acted properly in relying on legal advice of the Maryland Attorney General's office." *Id.* at 1027.

Our Court in *Wentz* considered a case in which an employee of a state school for the mentally retarded was fired. The employee claimed that he had a right to a hearing before being fired. The director of the school, before firing the employee, consulted an attorney who told the director that the employee was not a state employee under the law. We held that even though seeking advice of counsel will not satisfy a defendant's burden of acting reasonably, the employee in this case was in a "unique employment situation," and that the employee was not "clearly entitled to a hearing under state law." 721 F.2d at 247.

We do not believe that Norwest Bank and Jerry Miller confronted either a "perilous" or "unique" situation. Nor does this situation present the possible public concerns or urgency confronted by a law enforcement officer seeking a warrant for an arrest or search. *See Arnsberg v. United States,* 757 F.2d 971, 981 (9th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). Rather, we think this case much more closely resembles *Jones v. Preuit & Maudlin,* 822 F.2d at 998, where the Eleventh Circuit in dicta stated in regard to this issue that "seeking a writ of attachment is not normally a[n] 'extraordinary event.'" *Id.* at 1000 n. 3.

In this case, it does not appear that Norwest's attorney, Green, fully explained the import of the Supreme Court decisions on prejudgment creditor remedies. At the same time, he did not unequivocally assure Norwest of the constitutionality of the South Dakota attachment statute thus inviting complete reliance. In his letter to Jerry Miller, Green only mentioned the Supreme Court's decision in *Sniadach.* He noted that "[s]ince 1969 there have been many cases decided dealing with the constitutionality of garnishment laws, attachment laws, claim and delivery laws and other laws which generally allow a party to deprive another of property without notice

and without an opportunity to be heard." Green then went on to say that other state courts had declared similar attachment laws unconstitutional. He concluded that South Dakota's attachment law was distinguishable although "there is some risk" that Watertown Equipment could successfully attack its constitutionality.

Because Green's advice was somewhat equivocal and because this case does not present a unique factual situation or a "perilous" one which clearly demanded prompt action, we believe Green's advice to Norwest and Miller should not insulate them from liability for violating clearly established law.

### C. Green's Actions.

Appellee Green argues that he should not be held liable because he merely advised his client of the possible unconstitutionality of the South Dakota statute and instituted the attachment proceedings at the direction of the client. This question concerns whether Green acted "under color of state law" in advising Norwest and participating in the attachment procedure. It is clear that Norwest and Miller acted under color of state law in instituting an attachment under South Dakota law because they acted in "joint participation" with state officials in seizing Watertown Equipment's property.[8] *See Lugar*, 457 U.S. at 941, 102 S.Ct. at 2755 (private creditor acting under unconstitutional Virginia attachment law acted in joint participation with state officials and thus under color of state law).

In determining on remand whether Green also acted under color of state law, we note our discussion in *Buller* on this question. There, we said that the attorney may be liable under section 1983 because he caused garnishment proceedings to be instituted against the plaintiffs; as an attorney, was in a better position than his client to know the law; may have refused to comply with his client's request to release the debtor's property; and had a monetary interest in proceeding with the garnishment. 706 F.2d at 852.

We do not believe there is a discrepancy between our holding in *Buller* and our holdings in cases such as *Chapman v. Musich*, 726 F.2d 405 (8th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984), where this Court held that a public defender performing his or her traditional function as defense counsel did not act under color of state law, or cases such as *Dunn v. Hackworth*, 628 F.2d 1111 (8th Cir.1980) (per curiam), where we held that a private attorney was not acting under color of state law in acting as a defendant's counsel in a criminal proceeding. The purpose of the holding in these cases was not simply to insulate attorneys from liability under section 1983 but to protect the integrity of the judicial process and to recognize the independence of their action from the state. Thus, even non-lawyers, such as witnesses, cannot be sued under section 1983 for giving perjured testimony at trial. *See Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). In attachment proceedings and other cases, as the Supreme Court established in *Lugar*, the key is "joint participation" with state officials in depriving someone of his or her constitutional rights. *Cf. Tower v. Glover*, 467 U.S. 914, 920, 104 S.Ct. 2820, 2824, 81 L.Ed.2d 758 (1984) (holding a public defender acts under color of state law when not acting as an adversary of the state but instead conspiring with a state official). It is a factual question to be determined on remand whether Green's advice to Norwest and institution of the attachment proceeding was "joint participation" with state officials and thus action under color of state law.

We therefore hold that Norwest, Miller, and Green are not entitled to qualified immunity. We also hold that there is a factual question whether Green acted under color of state law. We remand to the district court for consideration of the merits of the state and federal claims.

---

8. Norwest acted on the basis of its policy-making unit, the Discount Committee, and thus was

a joint participant. *See Jones v. Preuit & Mouldin*, 808 F.2d 1435 at 1442 n. 3 (11th Cir.1987).