BARKETT, Circuit Judge,
dissenting:
I dissent, believing that the majority has misapplied First Amendment principles to the facts of this case.
As an initial matter, there is no question that public employees do not surrender their First Amendment speech rights merely by virtue of their employment. See, e.g., Pickering v. Bd. of Educ., 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The right of public employees to comment on issues of public concern— which is grounded in the right of all citizens to participate in political affairs — is so important that the Supreme Court has explained the history of that right as follows:
The issue was whether government employees could be prevented or chilled by the fear of discharge from joining political parties and other associations that certain public officials might find subversive. The explanation for the Constitution’s special concern with threats to the right of citizens to participate in political affairs is no mystery. The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment *1287 values, and is entitled to special protection.
Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citations and quotations omitted) (emphasis added).[1]
It is with these principles as a foundation that the Supreme Court has nonetheless recognized that the “free speech rights of public employees are not absolute,” Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), and that the interests of the government as employer in efficiently managing its offices and personnel might in certain cases outweigh the employee’s free speech rights, see Myers, 461 U.S. at 146, 103 S.Ct. 1684; Givhan, 439 U.S. at 414, 99 S.Ct. 693.[2]
However, the sacrifice of First Amendment rights by public employees in the interest of managerial efficiency is the exception, not the rule. To that end, the Supreme Court has ensured the broadest possible First Amendment protection for public employees by, among other things, holding specifically that the government’s managerial interests do not necessarily outweigh the rights of the employee to speak on a matter of public concern simply because the speech relates to his or her employment, nor, for that matter, because he speaks to his co-workers or supervisors rather than to the public. See, e.g., Garcetti v. Ceballos, 547 U.S. 410, 420-21, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).
The Court has long recognized that the fact that a public employee’s speech relates to his job is not dispositive because “[t]he First Amendment protects some expressions related to the speaker’s job.” Garcetti, 547 U.S. at 421, 126 S.Ct. 1951; see also Pickering, 391 U.S. at 572, 88 S.Ct. 1731. A logical corollary of this principle, particularly applicable in this case, is that how an employee comes to learn about an issue does not in itself indicate that his subsequent complaint about that issue is pursuant to his job duties. See, e.g., Lindsey v. City of Orrick, Missouri, 491 F.3d 892, 898 (8th Cir.2007) (city employee whose duties included park, water, and sewer maintenance and reporting on that maintenance at city council meetings was not speaking pursuant to official duties when he complained about violations of city sunshine laws, even though he learned of the violations at the city council meetings he was required to attend). As the Court has noted, speech on public issues cannot be properly safeguarded without some First Amendment protection for speech by public employees on job-related matters, because public employees are better equipped than the average citizen to “have informed and definite opinions” regarding issues related to their area of employment. Garcetti, 547 U.S. at 421, 126 S.Ct. 1951.
The Court has also long recognized that the fact that an employee chooses to speak to his supervisor rather than to the public does not in itself eliminate First Amendment protection:
That [the employee] expressed his views inside his office, rather than publicly, is not dispositive. Employees in some *1288 cases may receive First Amendment protection for expressions made at work. Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like any member of the general public to hold that all speech within the office is automatically exposed to restriction.
Garcetti, 547 U.S. at 420-21, 126 S.Ct. 1951 (citations and quotation omitted); see also Givhan, 439 U.S. at 415-16, 99 S.Ct. 693 (“Neither the [First] Amendment itself nor our decisions indicate that this freedom [of speech] is lost to the public employee who arranges to communicate pri-. vately 'with his employer rather than to spread his views before the public.”).[3]
Based on these cases, it is clear that public employees are both employees and citizens. Under the First Amendment, an employee/citizen can speak on a matter of public concern that relates to his job or place of employment, and he can address that issue of public concern to the newspaper or to his supervisors. How then do we distinguish between speech in the workplace that is protected under the First Amendment and speech that is not? This is the issue the Supreme Court recently attempted to clarify in Garcetti, when it held that public employees are not speaking in their role as citizens and may therefore constitutionally be subject to managerial discipline when they “make statements pursuant to their official duties.” 547 U.S. at 421, 126 S.Ct. 1951.
I believe the majority opinion misapplies Garcetti — which did not overrule the framework for analyzing public employee speech cases set forth in, among others, Pickering, Myers, and Givhan — to conclude that the employees’ speech regarding sanitary sewer overflow (“SSO” or “spill”) reporting, posting, and remediation is unprotected by the First Amendment.
To begin with, the record is undisputed that, unlike in Garcetti, the employees in this case had no official professional duty to report SSOs to state or federal environmental authorities, to post or remediate SSO sites, or to complain about the failure to do any of these things, but did so anyway out of concern for the health and safety of their community.[4] The employees were members of DeKalb County’s Compliance Unit and were responsible for drafting the County’s fat, oil, and grease (“FOG”) ordinances as well as a proposed permitting system. FOG ordinances are designed to tell the food service industry and the public how to properly discharge fats, oils, and grease into the county sewer *1289 system in order to prevent sewer blockages and overflows. The only duty the employees had with respect to SSOs was to determine whether a particular spill was caused by grease, which in turn would improve their ability to draft the FOG ordinances for which they were hired. The reporting, posting, and remediation of SSO sites was specifically entrusted to the County’s Construction and Maintenance Unit, of which the employees were not a part. Therefore, as the record makes clear, the sole connection between the employees’ complaints regarding SSO reporting, posting, and remediation and their jobs was the fact that the employees happened to be inspecting SSO sites for purposes of their FOG duties when they identified the problems.[5]
The majority brushes off these undisputed facts regarding the limited scope of the employees’ duties by repeatedly asserting that because the employees’ speech “owe[s][its] existence to [the employees’] official responsibilities and cannot reasonably be divorced from those responsibilities,” the employees’ speech is not protected. Thus, the essence of the majority opinion, with its emphasis on Garcetti’s phrase “owes its existence to,” appears to be that speech about anything a public employee learns about in the course of performing his job — here, the inspection of SSO sites for purposes of ascertaining whether grease was their cause — is unprotected, because the speech would not exist without the job activity. But this is not the holding of Garcetti
When examined in its proper context, the phrase “owes its existence to” cannot bear the weight the majority accords it. The phrase is found in one passage of the Garcetti opinion, as follows:
The significant point is that [Ceballos’] memo was written pursuant to Ceballos’ official duties. Restricting speech that owes its existence to a public employee’s professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.
547 U.S. at 421-22, 126 S.Ct. 1951. In other words, speech owes its existence to an employee’s professional responsibilities when the employer has “commissioned or created” it. Id. And, as the Garcetti Court emphasizes throughout the opinion, an employer commissions or creates speech when an employee speaks pursuant to official duties, not when that employee speaks outside of those commissioned duties — that is the “significant point” of the Garcetti opinion. Id.
Rather than focus on the opinion’s “significant point,” however, the majority broadly applies Garcetti’s “owes its existence” language to eliminate constitutional protection for all of the employees’ statements regarding SSOs, and in doing so *1290 effectively nullifies the Court’s admonishment that the fact that speech relates to the subject matter of the employee’s job is non-dispositive. See 547 U.S. at 421, 126 S.Ct. 1951. This is so because speech that relates to an employee’s job — which, according to Garcetti, still retains the possibility of First Amendment protection — will almost always “owe its existence” to that job. Therefore, a so-called “existence” test cannot end the inquiry. The employees’ speech regarding SSO reporting, posting, and remediation was admittedly prompted by their SSO research and therefore in a broad sense would likely not have existed without that research. However, because the employees were indisputably not responsible for reporting, posting, or remediating SSOs, their speech on those subjects could not owe its existence to their official duties, as the Garcetti opinion uses the phrase.
In Garcetti, deputy district attorney Richard Ceballos, acting as a calendar deputy during the period in question, spoke to his supervisors and a deputy sheriff about several concerns raised by a defense attorney regarding inaccuracies in an affidavit written by the deputy sheriff and used to obtain a search warrant. Id. at 413-14, 126 S.Ct. 1951. Unsatisfied with the explanation he received from the deputy sheriff about the inaccuracies, Ceballos prepared a case disposition memorandum explaining his concerns and recommended dismissing the case. Id. During a meeting about the memorandum attended by his supervisors, the deputy sheriff who had written the affidavit, and other employees from the sheriffs department, the discussion became heated, “with one lieutenant sharply criticizing Ceballos for his handling of the ease.” Id. Ceballos’s supervisor decided to proceed with the case in spite of Ceballos’s recommendation, and Ceballos was then called by the defense to testify during a hearing challenging the warrant. Id. at 414-15. Ceballos claimed that after these events, he was reassigned, transferred, and denied a promotion in retaliation for the memorandum, a violation of his First Amendment right of free speech. Id. at 415, 126 S.Ct. 1951.
In rejecting Ceballos’s argument, the Court held that “[t]he controlling factor in Ceballos’ case is that his expressions were made pursuant to his duties as a calendar deputy.” Id. at 421, 126 S.Ct. 1951. The Court noted that it was not disputed that Ceballos “prepared the memorandum pursuant to his duties as a prosecutor,” and that in light of the fact that “Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case,” he was speaking as an employee, rather than a citizen, and therefore was not entitled to First Amendment protection from employer discipline. Id. In other words, because Ceballos was not attempting to advise the “public” (through his supervisors, the press, or any other forum) about an issue of public concern, but was simply performing his specific job duties, “his supervisors were [not] prohibited from evaluating his performance.” Id. at 422, 126 S.Ct. 1951. The issue in Garcetti, as in Myers, was how Ceballos went about performing his job duties, and the effect of his conduct on his office and co-workers, not the content of his speech. Based on Pickering and its progeny, the Court reasoned that “the First Amendment does not prohibit managerial discipline based on an employee’s expressions made pursuant to official responsibilities.” Id. at 424, 126 S.Ct. 1951 (emphasis added).
Thus, speech owes its existence to the employee’s official duties — for Garcetti purposes — when something about the speech itself (for example, its content, tone, timing, or target) significantly affects the quality of that employee’s job performance, thereby triggering the government *1291 employer’s managerial or disciplinary rights. See Myers, 461 U.S. at 147, 103 5. Ct. 1684. In other words, had the employees been fired after they initially requested SSO data for purposes of doing them jobs (ie. drafting FOG ordinances), they would not be protected from retaliation by the First Amendment because the ivay they were doing their jobs had “ruffled feathers.”[6] The same cannot be said of speech indisputably not made pursuant to job duties, no matter how many feathers that speech ruffles and no matter what activity prompts the employee to make the speech. I believe this is the crucial distinction the Garcetti opinion, read as a whole, explicitly directs us to make — even if making that distinction means that certain statements in a “report” are protected while others are not.
I believe the record is clear that the employees were not speaking pursuant to their official duties, but rather as concerned citizens, when they complained about the reporting, posting, and remediation of SSOs. The majority relies on an overly broad reading of Garcetti — specifically, the Court’s one-time use of the phrase “owes its existence to” — to deny First Amendment protection to the employees’ speech, and in doing so sidesteps decades of Supreme Court precedent. I would therefore reverse the district court’s grant of judgment on the pleadings to the supervisors and remand for further fact finding.

. Moreover, the law is well established that the State may not demote or discharge a public employee in retaliation for speech protected under the First Amendment. Pickering, 391 U.S. at 574-75, 88 S.Ct. 1731 (1968); Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989).

. In Myers, for example, the Supreme Court held that when a public employee distributed a questionnaire to her co-workers in an effort to air various issues arising out of a "personal employment dispute,” 461 U.S. at 148 n. 8, 103 S.Ct. 1684, the First Amendment did not require her government supervisor to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships.” Id. at 154, 103 S.Ct. 1684.

. In light of this clear Supreme Court precedent, I do not agree with the majority that the fact that the employees chose to take their complaints to their supervisors rather than to the press “suggests that the [employees] did not believe that raising concerns about sewer overflows was exclusively the responsibility of someone else in some other unit of their department .....” In addition to the fact that the Supreme Court has said that an employee's choice of forum for speech is not dispositive, this statement is pure speculation, which should not be the basis of an appellate court's decision. For example, an equally plausible explanation is that the employees went to their supervisors as a matter of courtesy or discretion, or because they did not know who else to talk to, or because they believed their supervisors could most expeditiously bring the matter to the attention of the appropriate person.

. The employees complained specifically about (1) SSOs not being properly reported to the Georgia Environmental Protection Division, as required by law; (2) SSO sites not having proper posting; (3) the testing and determination of fish kill at SSO sites for reporting purposes; (4) the calculation of spill gallonage at SSO sites for reporting purposes; (5) SSOs not being properly cordoned off to protect the public from exposure to raw sewage; and (6) SSO sites not being properly bioremediated, causing a potential health hazard to the public.

. The testimony in this case, including that of the supervisors, confirms unequivocally that the employees had no official duties to report, post, or remediate SSO sites. In their amended complaint and their brief to the district court opposing judgment on the pleadings, the employees cite to the testimony elicited during their administrative hearing: under the Clean Water Act ("CWA”). Among other things, several of their fellow compliance inspectors confirmed that SSO reporting, posting, and testing did not fall within the responsibilities of the Compliance Unit. Petty testified that when he spoke to his supervisor Gudewicz about his health and safety concerns, Gudewicz told him that Petty’s only job with respect to SSOs was to determine whether grease was the "culprit.” Gudewicz also testified that he did not know anything about the posting requirements for SSOs until sometime in 2005 and that it was not his ■ responsibility to correct any inaccuracies on the SSO reporting forms. Similarly, Gudewicz's supervisor John Walker testified that the employees had no duties regarding the reporting, posting, or clean-up of SSO sites.

. The majority claims to reject the employees' position in this case in which we examine, for Garcetti purposes, only whether an employee’s job duties "mandated the act of speaking, as revealed by facts considered in isolation.” This is an incorrect characterization of the employees’ position, and mine. There is no question that speech not specifically mandated by an employee’s job might nevertheless be pursuant to the employee’s official duties and thus unprotected by the First Amendment. See, e.g., Boyce v. Andrew, 510 F.3d 1333 (11th Cir.2007) (caseworkers investigating child abuse and neglect were speaking pursuant to official duties when they complained to supervisors and union that they were overworked and expressed concern over the potential harm to the children as a result). For example, the employees themselves concede that their initial requests for SSO data were unprotected by the First Amendment because the requests were made as part of an effort to do their jobs not because their jobs specifically required them to speak. Indeed, it is undisputed that before their FOG duties were expanded to include ascertaining the cause of SSOs, the employees were discouraged from requesting SSO data in order to draft FOG ordinances. Therefore, it is clear that the actual position advocated by both the employees and my dissent is that we must examine, among other things, whether a public employee's job duties have any connection with the subject about which the employee speaks, not whether the job actually mandates the act of speaking. A DeKalb County employee in the Construction and Maintenance Unit responsible for reporting, posting, and remediating SSOs certainly could not argue that his complaint about the failure to report, post, or remediate SSOs is protected by the First Amendment because he was not officially required to complain. In other words, it is not just that the employees in this case had no duty to speak about a failure to report, post, or remediate SSOs — they had no duties related to that subject whatsoever.