# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-3299

———————

Charles Daniel Lindsey,  *

   *

  Plaintiff -Appellee,  *

   *   Appeal from the United States

 v.    *   District Court for the

   *   Western District of Missouri.

City of Orrick, Missouri,   *

   *

  Defendant,   *

   *

Shirley Taylor,    *

   *

  Defendant - Appellant.   *

———————

Submitted: February 14, 2007
Filed: June 26, 2007

———————

Before WOLLMAN, BYE, and SMITH, Circuit Judges.

———————

BYE, Circuit Judge.

Charles Daniel Lindsey sued the City of Orrick, Missouri (the City) and its mayor, Shirley Taylor, under 42 U.S.C. § 1983 alleging an unlawful dismissal of him for accusing the City Council (Council) of violating Missouri's open meetings law, accusations he claims were constitutionally protected speech. Taylor and the City

moved for summary judgment which was denied. Taylor appeals arguing the district court[1] erred in finding she was not entitled to qualified immunity. We affirm.

I

The facts viewed most favorably to Lindsey are as follows. The City employed Lindsey as its public works director from October 2001 to April 2005. His duties included maintaining the City's parks, water systems, streets, and sewers. As part of his position he was required to attend Council meetings to report about public works issues. While Lindsey did not actually live in or vote in the City, he worked for it and owned land there. Taylor was Lindsey's supervisor. The City is governed by both the mayor and a three-member, elected city council. In 2003, the City sent Lindsey to a day-long training session, part of which included a two-hour seminar on Missouri's open meetings or "sunshine" law. After the seminar, Lindsey became convinced the City was violating the open meetings law by improperly entering into non-public executive sessions and passing city ordinances without public discussion. According to Council meeting minutes, Lindsey raised the open meetings issue at four different public meetings.

At a February 6, 2003, City Council meeting, Lindsey reported to the Council about his attendance at the seminar and suggested the municipality improve its sunshine law compliance by making a written policy available to the public and creating a compliance committee. At the meeting, City Attorney John Newberry told Lindsey he believed none of the closed meetings he had attended violated the sunshine law. After the meeting, Lindsey contends he met with then-Council member Tom Shrier who warned Lindsey the other Council members were mad at him for raising the sunshine law issue and told him "the best thing you could do is shut up." At an

---

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

-2-

April 22, 2004, Council meeting, Lindsey questioned whether the Council had properly followed the sunshine law in its 2001 consideration of a retirement benefit ordinance which occurred prior to Lindsey's employment. His contention was the meeting where this ordinance was discussed should have been open to the public. According to Lindsey, several days later Taylor approached him behind city hall and told him the sunshine laws were none of his business and to think about what he was doing before he embarrassed the City.

At an October 20, 2004, meeting, Lindsey, believing the Council was violating the sunshine law by improperly going into executive session, read the sunshine law aloud and asked the Council not to "do an illegal meeting." Taylor and the Council subsequently did go into closed session "to have the mayor bring them up to date on a personnel issue from last month's meeting." The minutes reflect, after the meeting was reopened, there was a discussion as to the sunshine law. Finally, at a January 6, 2005, Council meeting, Lindsey addressed the Council again on the sunshine law. He asked the Council to evaluate their sunshine law compliance on February 6, 2003, with no response. He made another request again in April 2004 and since then had identified fifteen violations of the sunshine law. He described these perceived violations and told the Council they were "bypassing any open discussion" regarding new ordinances. Taylor stated the subject was "closed" as it had not been placed on the agenda prior to the meeting. Lindsey again asked the Council to review its procedures. At this point, at Taylor's direction, the Council entered a closed session purportedly to discuss personnel matters.

Lindsey testified, in 2004, he made an audiotape of one public Council meeting and made a videotape of another. During the third week of March 2005, Lindsey met with Taylor at her home. He told her he was going to schedule a meeting with an assistant attorney general to address the City's failure to comply with the sunshine law. He explained he had already called the state's attorney several times to discuss the issue. Less than a month later, on April 12, 2005, Lindsey was fired. Prior to

being fired, Taylor provided Lindsey with two handwritten critiques of his work. Lindsey contended none of the job deficiencies listed in these critiques had been brought to his attention previously. Taylor gave Lindsey the second critique on April 11, 2005, which listed as a specific complaint: "Several times [Lindsey] has basically attacked the Council at the meetings and told them they were not handling city business or ordinances properly." Lindsey attempted to discuss the critique at a Council meeting that evening but was told the Council did not need to check the critique's accuracy. The next day, Taylor gave Lindsey a letter informing him he had been fired.

This litigation followed. The City and Taylor each moved for summary judgment. The district court denied the motion, finding Lindsey had engaged in protected speech, and his First Amendment right was clearly established such that a reasonable official in Taylor's position would have known it was illegal to fire Lindsey for his speech. The district court held Taylor was not entitled to qualified immunity and found there was an issue of fact as to whether Taylor fired Lindsey. Taylor appeals both the denial of qualified immunity and the district court's conclusion there was a disputed issue regarding whether she fired Lindsey.

II

A defendant can appeal a district court's denial of qualified immunity pursuant to the collateral order doctrine. Beck v. Wilson, 377 F.3d 884, 888-89 (8th Cir. 2004). "We review de novo a district court's denial of a motion for summary judgment on grounds of qualified immunity." Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007). "Generally, government officials are entitled to qualified immunity under section 1983 when executing discretionary functions, unless the officials violate clearly established law." Beck, 377 F.3d at 889. To determine whether Taylor is entitled to qualified immunity, we engage in a two-part analysis. "The 'threshold question' is whether, taking the facts in the light most favorable to the injured party, the alleged facts

demonstrate that the official's conduct violated a constitutional right." Clemmons v. Armontrout, 477 F.3d 962, 965 (8th Cir. 2007). If the answer to this question is yes, we next ask whether the right is clearly established or, put another way, "whether it would be clear to a reasonable [official] that [her] conduct was unlawful in the situation [she] confronted." Id. (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

A

Our first inquiry is whether Lindsey has asserted a First Amendment violation. In Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), the Supreme Court recently clarified the inquiry for whether a public employee receives First Amendment protection. As the Court reinforced: "public employees do not surrender all their First Amendment rights by reason of their employment." Id. at 1957. But to trigger constitutional protection, an employee must "speak as a citizen addressing matters of public concern." Id. (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).

Taylor first argues Lindsey's statements regarding sunshine law compliance are not protected speech under the First Amendment because Lindsey was not speaking as a citizen and further was not speaking on a matter of public concern. Although Taylor conflates these separate inquiries, we consider each of them in turn.

The Garcetti Court clarified the "citizen" prong of the analysis, defining when a public employee speaks as a citizen rather than as an employee. In Garcetti, a deputy district attorney alleged he was transferred and demoted because he wrote a memorandum urging the dismissal of a case because of perceived misrepresentations in a search warrant affidavit. The Court held: "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960. The Court noted it was not dispositive that the deputy district attorney "expressed his views inside his office,

rather than publicly" and the memorandum in question "concerned the subject matter of his employment." Id. at 1959. The controlling factor was that "his expressions were made pursuant to his duties as a calendar deputy." Id. at 1959-60. The Court ultimately found the deputy district attorney "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case" as this was one of his calender manager duties. Id. at 1960. After Garcetti, a public employee does not speak as a citizen if he speaks pursuant to his job duties. See McGee v. Pub. Water Supply, Dist. #2, 471 F.3d 918, 919 (8th Cir. 2006) (holding a public water supply district manager's complaints about environmental compliance, although involving matters of public concern, were made pursuant to his official duties to ensure regulatory compliance and thus were not made as a citizen).

Taylor argues Lindsey's speech was not as a citizen as he was speaking at Council meetings which he was required to attend as part of his job. In addition, he learned about the sunshine law at a seminar paid for by the City. We disagree. Here Lindsey complained about sunshine law compliance at both Council meetings and during a private meeting with Taylor. It is undisputed Lindsey was required to attend and to present a water, sewer and street report at these meetings. His job duties included park, water, sewer, and street maintenance, as well as supervising the employees who assisted with these duties. Unlike in Garcetti and McGee, there is no evidence Lindsey's job duties even arguably included sunshine law compliance. Although Lindsey attended a training seminar which included a session on the sunshine law, there is nothing in the record to suggest the City sent him to the seminar to learn about the law or that he was subsequently charged with ensuring its compliance. Thus, we hold his speech regarding compliance was as a citizen.

Taylor next argues Lindsey's speech was not on a matter of public concern. She argues his complaints were self interested as they involved the Council's procedure for passing ordinances governing retirement and other municipal employee benefits. We disagree. "When a public employee's speech is purely job related, [his]

speech will not be deemed a matter of public concern." Buazard v. Meredith, 172 F.3d 546, 548 (8th Cir. 1999). In contrast, "[m]atters of public concern include matters of political, social, and other concern to the community." Belk, 228 F.3d at 882 (citing Connick v. Myers, 461 U.S. 138, 146 (1983)). In determining whether speech is protected, this court examines "content, form, and context of the speech as revealed by the entire record." Id. "Criticism, no matter how obnoxious or offensive, of government officials and their policies clearly addresses matters of public concern." Casey v. City of Cabool, 12 F.3d 799, 802 (8th Cir. 1993). This court has held speech which "criticizes a public employer in his capacity as a public official" addresses a matter of public concern. Belk v. City of Eldon, 228 F.3d 872, 882 (8th Cir. 2000). While we have not yet reached the issue, at least one other circuit has held a public official's violation of open meeting laws is a matter of public concern. See Dishnow v. Sch. Dist. of Rib Lake, 77 F.3d 194, 197 (7th Cir. 1996) (holding a school board's alleged violations of open meetings law was a matter of public concern); cf Barker v. City of Del City, 215 F.3d 1134, 1139 (10th Cir. 2000) (noting city-defendant conceded claimed violations of the state open meetings law by city council members was a matter of public concern).

In Casey v. City of Cabool, a police and fire dispatcher frequently expressed his disapproval of certain fire department policies and was fired after he threatened to contact the Missouri state auditor with his concerns. Casey, 12 F.3d at 800. As here, the city argued Casey was simply concerned with the end effect on his pocketbook rather than the policies he was criticizing. We found this argument unpersuasive, holding "[b]ecause Casey's speech amounted to straightforward criticism of government officials and policy . . . it falls squarely within the meaning of 'speech on a matter of public concern.'" Id. at 802. So too here, Lindsey's speech amounts to straightforward criticism of the Council's sunshine law compliance. While the record reflects some of the ordinances at issue involved retirement benefits, this was not the thrust of Lindsey's complaints. He was criticizing the Council's practices surrounding

the passage of ordinances and its apparent lack of sunshine law compliance. Such speech is clearly on a matter of public concern.

Taylor attempts to characterize Lindsey's speech at Taylor's home as a threat which is unprotected by the First Amendment. She cites United States v. Koski, 424 F.3d 812, 820 (8th Cir. 2005) and Missouri National Education Association v. New Madrid County R-1 Enlarged School District, 810 F.2d 164, 166-67 (8th Cir. 1987). Both of these cases are inapposite. Koski involved a criminal defendant who wrote a letter to the attorney general threatening injury and possible death to those government officials who had worked on his case. Koski, 424 F.3d at 820. Even if Lindsey's speech about contacting the attorney general's office could be characterized as a threat, this is not the type of threat conceived of in Koski. Likewise, in New Madrid, we recognized school officials could not claim First Amendment protection for terminating or threatening to terminate employees for failing to heed the school's wishes regarding union participation. New Madrid, 810 F.2d 164, 166-67. Again, the purported threat here is of a different class entirely. Such a threat is more akin to that in Casey, where a city employee threatened to contact the state auditor regarding the city clerk's and mayor's compliance with department policies. Casey, 12 F.3d at 801. As noted above, we held such speech was deserving of First Amendment protection. Furthermore, "[t]he inappropriate or controversial nature of a statement is irrelevant to the question [of] whether it deals with a matter of public concern." Rankin v. McPherson, 483 U.S. 378, 387 (1987). This is so because "'[d]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" Id. (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)).

Taylor also emphasizes she was not technically Lindsey's mayor as he does not live in the City. Taylor cites no authority, and we could find none, for the proposition that Lindsey must be a "citizen" of the City in order to engage in protected speech at Council meetings or with the City's mayor. It is Lindsey's United States citizenship

which triggers First Amendment protection. Whether or not he is a City resident is irrelevant to such inquiry. Taylor further argues the private forum of her home prevents Lindsey's speech from being on a matter of public concern. We have held, however, speech need not be in a public forum to be protected, especially when the speech is made to a public official about her conduct. See Belk, 228 F.3d at 879-801 ("Although the context of the speech must be considered, the fact that a plaintiff made statements in a private conversation about a public official toward whom she may have harbored personal animosity does not vitiate the status of statement as addressing a matter of public concern. . . . Private statements are particularly amenable to First Amendment protection when they are made to a public official in his official capacity.").

In sum, we conclude Lindsey's speech was both as a citizen and on a matter of public concern. At this juncture, the court generally engages in the Pickering balancing test, balancing the public employee's interest in speaking against his employer's interest in promoting the efficiency of the public service it performs through its employees. Hinshaw v. Smith, 436 F.3d 997, 1004 (8th Cir. 2006). As a threshold matter, however, we must ask whether Taylor has produced evidence to indicate the speech had an adverse impact on the efficiency of the City's operations. Belk, 228 F.3d at 878 (citing Sexton v. Martin, 210 F.3d 905, 911-12 (8th Cir. 2000)). Absent such a showing, "there are no government interests in efficiency to weigh against First Amendment interests" and we need not engage in the Pickering balancing test. Id. at 881. Here, the district court assumed the City made the threshold showing of disruption to trigger the Pickering balancing test but noted Lindsey had a "strong argument" the City and Taylor did not meet their burden. After careful review of the record, we disagree with the district court and hold the City and Taylor did not meet their burden to trigger the Pickering test.

To trigger the Pickering balancing test, a public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded

the plaintiff's performance or impaired working relationships. <u>Washington v. Normandy Fire Prot. Dist.</u>, 272 F.3d 522, 527 (8th Cir. 2001). Mere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient. <u>Belk</u>, 228 F.3d at 881; <u>Sexton</u>, 210 F.3d at 912. In <u>Sexton</u>, two public employees were discharged after they went to city hall and disclosed to the public they believed the city had been engaging in unlawful wiretapping. <u>Id.</u> at 908. In its attempt to trigger the <u>Pickering</u> balancing test, the city provided testimony that the report of illegal activity had adversely affected employee morale and had damaged "the Department's reputation and created significant political problems." <u>Id.</u> at 912. We held these simple, unsupported allegations of disruption were insufficient to trigger <u>Pickering</u>. <u>Id.</u>; <u>see also</u> <u>Kincade v. City of Blue Springs</u>, 64 F.3d 389, 398-99 (8th Cir. 1995) (finding mere assertion that contested speech "caused the City problems" and "adversely affected the efficiency of [the] City's operations and substantially disrupted the work environment," with no supporting evidence, insufficient to trigger <u>Pickering</u>); <u>Barker</u>, 215 F.3d at 1140 (reversing summary judgment where the city never "articulated how [the public employee's] speech actually, or even potentially, disrupted its governmental functions").

Here, Taylor points to scant evidence of any disruption of the City's functions as a result of Lindsey's speech either at the Council meetings or at her home. She notes Lindsey testified Council members disliked him and further that Lindsey taped certain Council meetings. As an initial matter, we find Lindsey's taping of two public Council meetings irrelevant to our inquiry, as this was not his alleged protected speech. Our inquiry is whether his protected speech disrupted City operations. There is some evidence in the record Lindsey argued with both Taylor and the Council. Taylor does not, however, claim this caused a disruption. She states simply "when an employee attacks elected officials it has a direct and adverse effect on that relationship" and "strains in that relationship are apparent." Taylor also references Lindsey's testimony he believed the Council members disliked him. Even if the Council members disliked Lindsey, this is not enough to show his speech caused the

dislike or such dislike impaired his working relationship with these individuals. Taylor's claim Lindsey's speech undermined the Council's authority in front of citizens is similarly unsupported. She calls his speech "confrontational and disruptive" but does not explain how or if his speech actually disrupted the City's functions. Under Sexton, such "vague and conclusory statements do not demonstrate with any specificity that the speech created disharmony in the workplace, impeded [Lindsey's] ability to perform [his] duties, or impaired working relationships with other employees." Sexton, 210 F.3d at 912-13. Therefore, we hold Taylor has not alleged sufficient disruption to trigger Pickering.

B

Our next inquiry is whether Lindsey's First Amendment right was clearly established such that a reasonable official would have known firing him was unlawful. Taylor first contends Lindsey has not shown his right was clearly established because the district court employed the Pickering balancing test. Because we hold Taylor did not make a sufficient showing to trigger the Pickering balancing test, this argument has been rendered moot.

Taylor also argues it was reasonable for her to fire Lindsey given his "insubordination." She claims she gave Lindsey a list of job deficiencies and, rather than correct them, he argued with her about the list. As such, she had "every right" to fire him. Essentially, Taylor argues she had legitimate reasons to fire Lindsey. This exceeds the scope of our review. See Powell v. Johnson, 405 F.3d 652, 655-56 (8th Cir. 2005) (holding, in an interlocutory appeal from the denial of qualified immunity, this court lacks jurisdiction over claim the public employee would have been demoted for a legitimate job related reason notwithstanding his protected activity).

-11-

In her reply brief, Taylor further argues her mistake as to what the law required was reasonable, and therefore qualified immunity is warranted. She characterizes Lindsey's repeated complaints regarding the sunshine law as a "closed issue." She claims it was reasonable for her to rely on the city attorney's opinion on this subject and consider the issue "concluded." As such, she reasonably misapprehended the law in this instance. As an initial matter, Taylor did not raise this argument in her opening brief. Absent some justification, we generally will not consider such new arguments. See Bearden v. Lemon, 475 F.3d 926, 930 (8th Cir. 2007) (holding it is well settled this court will not consider an argument raised for the first time in a reply brief). Even if we were to consider this argument, we conclude the city attorney's limited opinion about sunshine law compliance does not transform Lindsey's termination into something objectively reasonable. The record does not show Taylor asked the city attorney for his opinion after Lindsey spoke out about compliance. Nor does it show Taylor sought the attorney's advice in whether firing Lindsey would violate his First Amendment rights. The only opinion from the city attorney came prior to Lindsey's protected speech and did not address his complaints.

This court has "taken a broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry." Sexton, 210 F.3d at 909 (quoting Boswell v. Sherburne Co., 840 F.2d 1117, 1121 (8th Cir. 1988)). The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Thus, the question here is whether a reasonable official could have thought she could fire Lindsey in the face of his speech. On these facts the answer is no. This court has held "no right is more clearly established than freedom of speech, and . . . speech alleging illegal misconduct by public officials occupies the highest rung of First Amendment hierarchy." Hall, 235 F.3d at 1068; see also Belk, 228 F.3d at 882 ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.") (quoting Rankin v. McPherson, 483 U.S. 378, 383 (1987)). Although neither the

Supreme Court nor this court has considered a completely analogous case—one involving an employee's dismissal after speech alleging violations of open meetings law that is not our inquiry. In Hope v. Pelzer, 536 U.S. 730 (2002), the Supreme Court changed the clearly established law inquiry from a hunt for prior cases with precisely the same facts to asking whether the official had fair notice her conduct was unconstitutional. Id. at 741 ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."); see also Sexton, 210 F.3d at 911 ("In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful.").

This court has held it clearly established a public employer may not discharge an employee for disclosing the potential illegal conduct of public officials. Id. Other circuits have held a public employee establishes a First Amendment violation where it is alleged he was terminated for disclosing violations of state open meetings law. Dishnow, 77 F.3d at 197 (holding, where a school counselor informs the media about a school board's violation of open meetings law, "he was participating in a public dialogue on matters of interest to the public, and no more was required to place his speech, prima facie, within the protection of the First Amendment"); see also Barker, 215 F.3d at 1140 (reversing summary judgment on public employee's free speech claim where she spoke during a city council meeting and to the press about the city council's violation of Oklahoma's open meetings law); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 56 (2d. Cir. 1987) (reversing grant of summary judgment on First Amendment claim where firefighter was terminated in part for complaining to the Connecticut Freedom of Information Commission about a closed meeting of the Board of Fire Commissioners). In light of these cases, we hold a reasonable official would have realized it was illegal to terminate Lindsey for speaking out about the City's perceived violations of Missouri's sunshine law. As such, the district court correctly held Taylor is not entitled to qualified immunity.

## III

Finally, Taylor argues she did not fire Lindsey, and is therefore an inappropriate defendant in this action. The district court found there was a disputed issue of fact regarding whether Taylor was a decision maker in the firing decision. We are without jurisdiction to review this finding. See Hawkins v. Holloway, 316 F.3d 777, 781 (8th Cir. 2003) ("[W]e have jurisdiction to review whether an official is entitled to immunity to the extent the question turns on an issue of law, but we may not review a district court's conclusion that the pretrial record presents a sufficient factual dispute requiring a trial."); see also Kahle, 477 F.3d at 549 ("In this type of interlocutory appeal . . . if the issues relate to whether the actor actually committed the act of which he is accused we have no jurisdiction to review them in an interlocutory appeal."). As such, we cannot review the district court's conclusion.

## IV

For the foregoing reasons, we affirm the district court.

_____