# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3249

_____

Ron Nord

*Plaintiff - Appellee*

v.

Walsh County, a North Dakota political subdivision; Lauren W. Wild, individually
and in his capacity as Sheriff of Walsh County

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of North Dakota - Fargo

_____

Submitted: October 23, 2013
Filed: June 26, 2014

_____

Before GRUENDER, BEAM, and SHEPHERD, Circuit Judges.

_____

BEAM, Circuit Judge.

Ron Nord brought this 42 U.S.C. § 1983 action against Walsh County (the
"County") and Lauren Wild, both in his individual capacity and in his capacity as
sheriff of Walsh County, alleging violations of his First Amendment and Fourteenth
Amendment rights and various state law claims. Wild moved for summary judgment
based upon qualified immunity as to Nord's First Amendment claim, which the

district court denied.[1]  Wild, supported by the County, brings this interlocutory appeal.[2]  We reverse.

## I.    BACKGROUND

From 1991 until his termination on November 3, 2010, Nord was employed as a deputy sheriff in Walsh County, North Dakota.  He served at the pleasure of Sheriff Lauren Wild, who had been the duly elected sheriff since 1989.  In early 2010, Nord entered the sheriff election, running against Wild.  Both Nord and Wild earned

---

[1]Wild apparently did not raise qualified immunity as a defense to the alleged Fourteenth Amendment violation.  Accordingly, that issue is not before us in this appeal.

[2]We have jurisdiction under the collateral order doctrine to hear this interlocutory appeal of the district court's denial of Wild's qualified immunity defense. Robbins v. Becker, 715 F.3d 691, 693 (8th Cir. 2013); see also Owen v. City of Independence, Mo., 445 U.S. 622, 638-39 (1980) (recognizing that the qualified immunity defense is available to individuals, not to local government units).  We "'may not consider summary judgment on the merits of the case at this interlocutory stage.'" Lockridge v. Bd. of Trs., of the Univ. of Ark., 315 F.3d 1005, 1012 (8th Cir. 2003) (en banc) (quoting Mettler v. Whitledge, 165 F.3d 1197, 1202 (8th Cir. 1999)). Accordingly, our jurisdiction in this appeal does not extend to the denial of summary judgment on the other federal and state law claims in this appeal.  The County and Wild also appeal the district court's findings related to the municipality liability claim. "We will exercise pendent [appellate] jurisdiction over such an appeal only in the 'exceptional circumstance' in which it is 'inextricably intertwined' with the qualified immunity appeal, which occurs when the resolution of the qualified immunity claim 'necessarily resolves the pendent claims as well.'" S.L. ex. rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs, 725 F.3d 843, 854 (8th Cir. 2013) (quoting Lockridge, 315 F.3d at 1012).  We decline to exercise our pendent appellate jurisdiction here.  Therefore, the only claim properly before us in this appeal is Wild's qualified immunity defense to Nord's First Amendment claim.

-2-

enough votes in the primary election to appear on the general election ballot.[3] During Nord's campaign, he maintained his position as deputy sheriff without any change in pay or benefits and, according to Wild's deposition testimony, performed his duties as deputy sheriff. Nord does not assert that Wild in any way interfered with his campaign efforts. On November 2, 2010, Wild won the election.

The day following the election Wild called Nord into the office at 8:00 a.m., rather than his scheduled 1:00 p.m. shift, and terminated Nord's employment. Prior to terminating Nord, Wild consulted Tanya Wieler, the County's human resources consultant, and Barbara Whelan, the Walsh County attorney, regarding Nord's tenure. Both Wieler and Whelan told Wild he was within his authority as sheriff to terminate Nord.

Nord's termination caused some unrest in the County and resulted in a recall election, which Wild also won. During the recall election, Wild made statements that Nord was fired in accordance with an "unwritten rule" that deputy sheriffs who run against the sheriff will be fired and for certain statements Nord made during the campaign. After his termination, Nord searched for another job, and in May 2011, was hired as a deputy in the Grand Forks County Sheriff's Department.

On December 17, 2010, Nord filed this § 1983 lawsuit against Walsh County and Wild. Nord alleged that he was fired in retaliation for the statements he made along the campaign trail, statements, he claims, that were protected by the First Amendment. Wild moved for summary judgment asserting a qualified immunity defense, which the district court denied. Wild appeals the denial of qualified immunity.

---

[3]In North Dakota, sheriff elections are conducted using a non-partisan ballot which excludes political party designations. N.D. Cent. Code § 16.1-11-08. The two candidates receiving the most votes in the primary advance to the general election. Id. § 16.1-11-37.

## II. DISCUSSION

We review a denial of summary judgment on the grounds of qualified immunity de novo. Stoner v. Watlingten, 735 F.3d 799, 802 (8th Cir. 2013). "Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. (quotation omitted). We have limited jurisdiction to hear an interlocutory appeal of a district court's denial of qualified immunity. Robbins v. Becker, 715 F.3d 691, 693 (8th Cir. 2013). We may review a district court's order denying such immunity to the extent that it turns on an issue of law, but we have no jurisdiction if the pretrial record sets forth genuine issues of fact necessary for resolution of the interlocutory appeal. Id. No such factual issues present themselves in this case.

"In a § 1983 action, qualified immunity shields a government official from liability unless his conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Coker v. Ark. State Police, 734 F.3d 838, 841-42 (8th Cir. 2013) (internal quotations omitted). Qualified immunity analysis requires a two-step inquiry: "'(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" Winslow v. Smith, 696 F.3d 716, 731 (8th Cir. 2012) (quoting Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009)). Unless both of these questions are answered affirmatively, an appellant is entitled to qualified immunity. Id. And, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

We begin with the first step of the qualified immunity inquiry. In this limited context, Wild concedes that Nord was terminated in violation of his First Amendment

-4-

rights under the first prong of the investigation. Assuming, without holding, that this is true, we conclude that step one of the qualified immunity analysis has been sufficiently established for purposes of further inquiry.

Despite this concession, Wild contends that given the circumstances of this dispute, qualified immunity nonetheless protects him because his act of terminating Nord did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quotation omitted).

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (internal citation omitted).

As the Supreme Court has recently reiterated, "'[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" Stanton v. Sims, 134 S. Ct. 3, 5 (2013) (per curiam) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (internal quotation omitted)). In addition, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. (quotation omitted).

To evaluate whether Nord makes out a claim that his constitutional rights were clearly established and violated by Wild's act of termination, we must determine whether or not his particular speech was protected by the First Amendment. Sexton

v. Martin, 210 F.3d 905, 910 (8th Cir. 2000). This inquiry is one of law, not fact. Hinshaw v. Smith, 436 F.3d 997, 1004 (8th Cir. 2006).[4]

This protected or not conundrum and well-established Supreme Court precedent brings into play the use of the so-called Pickering/Connick balancing test. See Pickering v. Bd. of Educ., 391 U.S. 563 (1968); Connick v. Myers, 461 U.S. 138 (1983); see also Shockency v. Ramsey Cnty., 493 F.3d 941, 949 (8th Cir. 2007). As an initial matter, if the record supports the application of the test, it provides a balancing of Nord's First Amendment rights against Wild's state government employer prerogatives in an exercise that determines whether the contours of Nord's asserted rights were clearly enough established to make Wild's conduct actionable. See Shockency, 493 F.3d at 948.

_____

[4]As the dissent recognizes, this inquiry is sometimes fully addressed in the first step of qualified immunity, see post at 16-17. More often, however, such initial inquiry also informs the analysis of the second step of the qualified immunity test. See Pearson, 555 U.S. at 236 ("[I]t often may be difficult to decide whether a right is clearly established [and constitutionally protected] without deciding precisely what the [particular] constitutional right happens to be." (first alteration in original) (quotation omitted)). Given the nature of the concession in this case, it is necessary to apply the Pickering/Connick balancing test at this point in order to determine whether the asserted constitutional right was clearly enough established for the Stanton-Court-described reasonable official to understand whether or not there is a violation of the right. See Stanton, 134 S. Ct. at 5. In this regard, it should also be noted that all cases cited by the dissent on page 18 were decided prior to the Supreme Court's decision in Pearson, in which the Court held that "the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236. In those opinions the court did not have the discretion to begin its analysis at the second step of the qualified immunity inquiry.

If, upon application of the test, Nord's rights were not clearly established, Wild is, of course, entitled to a qualified immunity defense against Nord's claims. Indeed, if the evidence in the record is sufficient to proceed with the Pickering/Connick balancing exercise, this circuit has held that "the asserted First Amendment right will rarely be considered clearly established." Hall v. Mo. Highway & Transp. Comm'n, 235 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether and how to apply Pickering/Connick, we turn to the record to make a substantive analysis of Nord's speech and Wild's rights as a public employer. See Pickering, 391 U.S. at 568-70. This analysis requires a two-step inquiry. "First, we determine whether the employee's speech can be 'fairly characterized as constituting speech on a matter of public concern.'" Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000) (quoting Connick, 461 U.S. at 146). "Second, if the speech addresses a matter of public concern, we balance the 'interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. (alteration in original) (quoting Pickering, 391 U.S. at 568).

> [A]pplying the Pickering test we weigh the employee's right to engage in the particular speech . . . with such considerations as "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

Hinshaw, 436 F.3d at 1005 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

Thus, under Pickering/Connick, this court's task involves an analysis of (1) the general authority and responsibilities of the employing government entity, (2) the nature and character of the specific employer-employee relationship, (3) the speech involved and (4) evidence tending to establish the speech's impact on the efficient operation of the government entity. See generally Connick, 461 U.S. at 147-153.

North Dakota counties are political subdivisions of the State. N.D. Const. Art. VII, § 2. As such, the county sheriff manages and enforces a substantive portion of the sovereign's policing powers. Indeed, the sheriff's office is, in significant part, the image of North Dakota law enforcement as seen by many citizens, especially in the more rural counties.

The Walsh County Sheriff's Department is relatively small, employing approximately ten officers and six jailers. We particularly focus on the officers, taking judicial notice that the policing mission is a seven-day per week, 24-hours per day operation. This presumably means that there will be times when a single deputy will present the face of the sheriff in the county, at least in an assigned district.

In Walsh County there is an official Sheriff's Department Policy Manual which contains the general description of a deputy sheriff's job duties: the deputy sheriff is "[u]nder the general supervision of the Sheriff to be responsible in an assigned district for general police work, prevention and detection of crime, the protection of life and property, and [to] perform duties as assigned."

The Supreme Court of North Dakota has recognized that "'the official acts of a deputy sheriff are the acts of the sheriff.'" Turnquist v. Kjelbak, 77 N.W.2d 854, 857 (N.D. 1956) (quoting Wilson v. Russell, 31 N.W. 645 (Dakota 1887) and Summerville v. Sorrenson, 136 N.W. 938 (N.D. 1912)). The deputy sheriff is the "deputy of the sheriff, not of the office of sheriff as distinct from the person holding the office, to act for the person who is sheriff, and by whom he is appointed."

-8-

Wilson, 31 N.W. at 650. The sheriff "creates" the deputy sheriff, and "he can at any time, while in office, at his own will destroy his official existence as his deputy." Id. The North Dakota Supreme Court has further recognized that the "act of the deputy is the act of the sheriff; he has no original power, but acts as the representative or agent of the sheriff, who is the principal." Turnquist, 77 N.W. at 857 (quotation omitted). Thus, Nord was employed as an agent of Wild.

Furthermore, North Dakota law grants the sheriff the ability to appoint its deputies. N.D. Cent. Code § 11-10-11. From this power, North Dakota Attorney General opinions indicate, the sheriff has the ability to terminate those same deputies. N.D. Op. Att'y Gen. 82-38 (1982) ("The sheriff has the authority to hire and fire deputies, within the number and salary set by the county commissioners. There is no statutory procedure under state law which the sheriff must follow in firing a person appointed by him."); N.D. Op. Att'y Gen. L-32 (1997) ("It has long been the position of this office that implicit in a county officer's power to appoint or hire an employee under N.D.C.C. § 11-10-11 is the power to fire that employee."). The Attorney General also opined, that absent a "just cause" requirement for termination or another source of constraint on the employer's discretion to terminate its employees, the general rule of employment at will is presumed. N.D. Op. Att'y Gen. L-333 (1993). In sum, based upon the above-precedent and a fair reading of North Dakota Attorney General opinions on the subject, a North Dakota sheriff, in the light of pre-existing law, could, and perhaps should, believe that his deputies are "at will employees."

Of greater importance, perhaps, is the latitude the courts accord a managing law enforcement officer in executing his official duties, including the hiring and firing of employees–especially subordinate officers. This circuit has recognized the deference given to law enforcement agencies. Buzek v. Cnty. of Saunders, 972 F.2d 992, 995 (8th Cir. 1992) ("[L]aw enforcement agencies, more than other public employers, have special organizational needs that permit greater restrictions on employee speech."); Crain v. Bd. of Police Comm'rs, 920 F.2d 1402, 1411 (8th Cir.

1990) ("More so than the typical government employer, the [Missouri Highway] Patrol has a significant government interest in regulating the speech activities of its officers in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution." (alteration in original) (quotation omitted)). Thus, in accord with the holding of Connick, ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review. Connick, 461 U.S. at 146. "[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." Id. at 151 (quotation omitted).

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

Id. at 151-52 (emphasis added).

With this in mind, we turn to Nord's speech leading to his termination. The record contains Wild's deposition taken by Nord and Nord's deposition taken by Wild. During the course of the interrogatories propounded by Nord's counsel, Wild testified that he had been told that Nord had indicated to voters that Wild's health was bad and that he should not be running for office because his health was so bad. And, Wild stated that he heard "[o]ne report . . . that my wife didn't even want me to run." Wild also stated that another report indicated that he had said "[he] was going to resign as sheriff in two years and run for [Joe Miller's (a state senator at the time)] position as senator." Wild testified that at least some of these statements were outright lies. Nord does not deny making some version of at least some such statements. Indeed,

-10-

he testified with regard to Joe Miller, downplaying his statement a bit, "I said: Joe, do you want to hear a good one? He said: what's that? I said: I hear Lauren [Wild] wants to run against you for the next election. Joe just smiled and said: bring it on." Nord was asked where he heard that information and Nord said, "I don't recall . . . talking between shifts and stuff." Concerning Wild's health, Nord stated "the only thing I recall is, one lady asked about his [Wild's health] . . . I said that he's had some blood pressure issues. And I said: just the joys of growing old."

It is important to note that Supreme Court precedent strongly implies that some speech may be protected and some may not. Connick, 461 U.S. at 146. Only when a public employee speaks upon matters of public concern, not matters of personal interest, is a federal court an appropriate forum in which to review the wisdom of a personnel decision made by a public agency. Id. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. And, this inquiry into the protected status of speech is one of law, not fact. Id. at 148 n.7. Certainly, political speech is often considered to be on a matter of public concern and deserving of First Amendment protection. Id. at 145 ("The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. . . . Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." (internal quotations omitted)). But, the Supreme Court continuously emphasizes the diminished value of false factual statements. United States v. Alvarez, 132 S. Ct. 2537, 2560-61 (2012) (cataloging the various cases in which the Court has concluded false speech has little to no value). Accordingly, if some of Nord's campaign statements were untrue, as contended by Wild, they may be deserving of less protection and were likely more in Nord's personal interest than items of public concern. Stated differently, the First Amendment permits Nord to utter matters of personal concern as he may wish but such matters are not necessarily protected by the First Amendment. Nord's

statements, however, even if viewed as a matter of public concern, "were not of such public and social importance as to override the [sheriff's] substantial interest in maintaining" the efficiency and reputation of the workplace, given the nature of the office, to overcome the employment of the Pickering/Connick balancing test. Crain, 920 F.3d at 1411 (internal quotation omitted).

Based upon the foregoing analysis, we conclude that use of the Pickering/Connick balancing test is clearly called for in this dispute. And, based upon the use of such test, we conclude (1) that at least some of Nord's campaign speech does not merit First Amendment protection; (2) that even if Nord's speech was fully protected by the Constitution, Wild could have reasonably believed that the speech would be at least potentially damaging to and disruptive of the discipline and harmony of and among co-workers in the sheriff's office and detrimental to the close working relationships and personal loyalties necessary for an effective and trusted local policing operation, Hinshaw, 436 F.3d at 1005, and, the above-mentioned adverse employer-employee circumstance did not need to become manifest in order to be acted upon promptly by Wild, Connick, 461 U.S. at 151-52; (3) that applying the second step of the qualified immunity inquiry, and considering North Dakota law and well-established state and federal jurisprudence, and especially the advice given by the Walsh County attorney and its human resources consultant, Sheriff Wild could have logically and rationally believed that his decision to terminate Nord was well within the breathing room accorded him as a public official in making a reasonable, even if mistaken, judgment under the circumstances. Stanton, 134 S. Ct. at 5; and thus (4) that Wild, as a matter of law, is entitled to qualified immunity to shield him from any liability claimed to have arisen through violation of the First Amendment as asserted by Nord. Coker, 734 F.3d at 841-42.

The district court, however, never attempted to reach the Pickering/Connick balancing test, stating, instead that Wild failed to establish that Nord's speech "disrupted the workplace." This holding, which we review de novo, ignored the

-12-

obvious fact that Nord was never in the "workplace" after the conclusion of the November 2010 sheriff's election. But, as earlier noted, Supreme Court precedent does not require him to have been active in the workplace as a condition precedent to the employment of the Pickering/Connick test. We repeat, there is "no necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Connick, 461 U.S. at 152.

As an aside, on appeal the parties dispute whether we should apply the Pickering/Connick test, as we did, or the test developed in Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980) (the Elrod/Branti test). While the district court does not discuss this test, we pause briefly to do so and find that it does not support Nord's claim.

Subsequent to Pickering, through its analysis in Elrod and Branti, "the Supreme Court established that the termination of a government employee based on the employee's political affiliation violates the First Amendment unless the hiring authority can demonstrate that party affiliation is an appropriate and reasonable requirement for the effective performance of the public office involved." Hinshaw, 436 F.3d at 1005. Under the Elrod/Branti set of cases, the court may forego the Pickering balancing test. Id. In such cases, the hiring authority must demonstrate that party affiliation is an appropriate and reasonable requirement for the effective performance of the public office involved. Id. "'[T]he ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.'" O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 719 (1996) (alteration in original) (quoting Branti, 445 U.S. at 518).

-13-

This circuit has held that "[i]f discharge solely because of party affiliation is found, this will involve applying the narrow [Elrod/Branti] justification test," but "[i]f a discharge for overt expressive conduct is found, it will involve application of the [Pickering/Connick] balancing test." Hinshaw, 436 F.3d at 1005 (first alteration in original) (quotation omitted). Where speech is intermixed with a political affiliation requirement, the Pickering/Connick balancing is appropriate. Id. at 1006; see also O'Hare Truck Serv., 518 U.S. at 719. Given the nature of Nord's claim–that he was fired in accordance with the "unwritten rule" and for statements he made along the campaign trail–his claim is best characterized as an "intermixed case," necessitating the Pickering/Connick test. And, even when the Pickering/Connick balancing is applied, rather than the Elrod/Branti test, the "employee's status as a policymaking or confidential employee," traditionally considered under Elrod/Branti, weighs in favor of the government's side of the balancing scale. Hinshaw, 436 F.3d at 1007.

At bottom, the nature of Nord's position is more similar to that of the deputies in Jenkins v. Medford, where deputy sheriffs were fired for campaigning for the sheriff's opponents. 119 F.3d 1156 (4th Cir. 1997). There, the Fourth Circuit held "North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations." Id. at 1164. The court in Jenkins recognized that the North Carolina deputy sheriffs acted as agents for the sheriff, similar to North Dakota deputies. Id. at 1162. The court reasoned that where the position "resembles a policymaker, a communicator, or a privy to confidential information, then loyalty to the sheriff is an appropriate requirement for the job," and concluded that "newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity" because either "basis serves as a proxy for loyalty to the sheriff." Id. at 1164 (internal quotation omitted). For reasons similar to those expressed in Jenkins, loyalty is an appropriate requirement for the deputy sheriff position in the instant case, and accordingly the confidential nature of Nord's employment weighs heavily on the government's side of the Pickering/Connick balancing, which conclusion likewise

-14-

supports our denial of qualified immunity because Wild's actions did not violate a clearly established constitutional right.

## III.   CONCLUSION

For the reasons stated herein, we reverse the district court's decision to deny qualified immunity to Wild on Nord's First Amendment claim and remand for further proceedings not inconsistent with this opinion.

SHEPHERD, Circuit Judge, dissenting.

I respectfully dissent from the majority's reversal of the district court.  The majority states that in order to determine whether Nord's free speech rights were clearly established it is necessary to decide whether "his particular speech was protected by the First Amendment." Ante at 5.  However, Wild has conceded that Nord's speech was protected and that he terminated Nord for exercising his First Amendment rights, and the majority has accepted this concession.  Thus, we need not determine anew whether Nord's speech was protected.  After Wild's concession, and the majority's acknowledgment that Nord's First Amendment rights had been violated, the sole remaining question under qualified immunity review is whether Nord's right—to engage in protected campaign speech directed against his opponent and boss without being terminated—was clearly established, a question to which an analysis under the two-step Pickering/Connick balancing test is unwarranted. Because Nord's rights were clearly established, and because the Elrod/Branti exception does not apply, I would affirm the denial of qualified immunity.

I.

As the majority notes, the qualified immunity inquiry is two-fold: (1) whether the facts asserted demonstrate a violation of plaintiff's constitutional right and

-15-

(2) whether such right was clearly established at the time of the defendant's conduct. Winslow v. Smith, 696 F.3d 716, 731 (8th Cir. 2012). Under the first step, we must determine whether Wild violated Nord's constitutional right. Id. The answer to that question is clear. Wild, in his brief to the district court and during oral argument before this court, conceded "solely for purposes of summary judgment, that Nord was terminated for his election campaign speech – or put another way, Nord was terminated for exercising First Amendment rights." Therefore, I agree with the majority's conclusion that, for purposes of further inquiry, the first prong of the qualified immunity analysis has been established.[5]

I part with the majority's reasoning, however, in its treatment of the second prong of the qualified immunity analysis. There, the majority relies on Sexton v. Martin, 210 F.3d 905, 908 (8th Cir. 2000), and applies the Pickering/Connick balancing test to ascertain whether Nord's speech was protected by the First Amendment, a question already answered in the affirmative by Wild's concession, which the majority has accepted. Moreover, inquiry under the Pickering/Connick balancing test does not occur at the second step of the qualified immunity analysis but appropriately occurs at the first step to determine whether a constitutional violation occurred.

In adverse employment actions involving the First Amendment and the qualified immunity defense, the Pickering/Connick test is employed to determine

---

[5]Despite our discretion to decide which of the two prongs of the qualified immunity analysis to address first, Pearson v. Callahan, 555 U.S. 223, 236 (2009), both the majority and I have chosen to begin with and accept as established the first step of the qualified immunity analysis. As such, we have accepted that a constitutional violation has occurred and, thus, have already determined that Nord's speech was indeed protected. Accordingly, Wild, through his concession and our acceptance of that concession, in my opinion, has not placed the Pickering/Connick test at issue.

whether an employee suffered an adverse employment action for engaging in constitutionally protected activities. See Rankin v. McPherson, 483 U.S. 378, 384 (1987). Accordingly, by applying the Pickering/Connick test, we analyze whether an employee's First Amendment rights were violated, a determination that occurs at the first step of the qualified immunity analysis. Although the majority relies on this court's qualified immunity framework in Sexton, Sexton contains an unfortunate description of the qualified immunity analysis that erroneously misplaces the application of the Pickering/Connick test in the second half of the analysis. Such placement does not fit squarely with binding authority in this circuit.

For example, in Kincade v. City of Blue Springs, Missouri, the case that the Sexton Court relied on for its analytical framework, we first analyzed whether the employee was discharged for expressing constitutionally-protected speech.[6] 64 F.3d 389, 395 (8th Cir. 1995). The court determined, applying the Pickering/Connick test,

---

[6]As we have previously explained,

> Courts addressing claims by public employees who contend that they have been discharged for exercising their right to free speech must employ a two-step inquiry. Dunn v. Carroll, 40 F.3d 287, 291 (8th Cir. 1994). First, the court must determine whether the speech may be described as "speech on a matter of public concern." Connick v. Myers, 461 U.S. 138, 146 (1983). If so, the second step involves balancing the employee's right to free speech against the interests of the public employer. Rankin, 483 U.S. at 388 (citing Pickering v. Board of Educ., 391 U.S. 563, 568 (1968)). The focus is on striking "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [public employer] in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

Kincade, 64 F.3d at 395.

that the speech was in fact protected and a constitutional violation occurred when the employee was discharged from his employment based on his speech. Id. at 396-98. We then proceeded to determine whether the employee's right to utter constitutionally-protected speech was clearly established. Id. at 398. Thus, proper application of the Pickering/Connick test determines whether the employee's rights were violated, not whether the right was clearly established.

Even prior to Kincade, this circuit employed the Pickering/Connick test solely to determine whether there was a constitutional violation. See Dunn v. Carroll, 40 F.3d 287, 291 (8th Cir. 1994); see also Lewis v. Harrison Sch. Dist. No. 1, 805 F.2d 310, 316 (8th Cir. 1986); Brockell v. Norton, 732 F.2d 664, 667 (8th Cir. 1984). Indeed, more recently, we have continued to apply the Pickering/Connick test when determining whether a constitutional violation occurred. See, e.g., Shockency v. Ramsey Cnty., 493 F.3d 941, 948 (8th Cir. 2007); Lindsey v. City of Orrick, Mo., 491 F.3d 892, 898 (8th Cir. 2007) (proceeding to the second step of the qualified immunity analysis after determining that, under the Pickering/Connick test, the employee had successfully asserted a constitutional violation under the first step); Hinshaw v. Smith, 436 F.3d 997, 1004, 1008 (8th Cir. 2006) (determining that because there was no constitutional violation under the Pickering/Connick test, there was no need to determine whether the right was clearly established). Accordingly, the Pickering/Connick test properly determines the first step of the qualified immunity analysis. Although, as the majority notes, the Pickering/Connick test may be considered when determining whether a right was clearly established, such consideration only occurs once the Pickering/Connick test has already been *put into play* when determining whether a constitutional violation occurred. See Kincade, 64 F.3d at 398 ("'[W]hen Pickering's fact-intensive balancing test is *at issue*, the asserted First Amendment right can rarely be considered 'clearly established' . . . .'" (alteration in original) (emphasis added) (quoting Buzek v. Cnty. of Saunders, 972 F.2d 992, 997 (8th Cir. 1992)); see also Lindsey, 491 F.3d at 901 (rejecting the employer's argument that the employee's right was not clearly established under the

-18-

<u>Pickering</u> balancing test because the <u>Pickering</u> balancing test had not been placed in issue when analyzing whether a constitutional violation occurred).

Because the <u>Pickering/Connick</u> test informs the first step of the qualified immunity analysis and the majority has already acknowledged that the first step has been met, in my opinion, the majority erred in stating that "we must determine whether or not Nord's particular speech was protected by the First Amendment," <u>ante</u> at 5, and, thus, was mistaken in its conclusion that, under the <u>Pickering/Connick</u> balancing test, Nord's rights were not clearly established. Consistent with a proper qualified immunity framework, I would hold that Nord's First Amendment rights were clearly established and the qualified immunity defense fails.

We have said that "[n]o right is more clearly established in our republic than freedom of speech." <u>Casey v. City of Cabool, Mo.</u>, 12 F.3d 799, 804 (8th Cir. 1993). "'[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.'" <u>Burson v. Freeman</u>, 504 U.S. 191, 196 (1992) (quoting <u>Eu v. S. F. Cnty. Democratic Cent. Comm.</u>, 489 U.S. 214, 223 (1989) (internal quotation marks omitted)); <u>see</u> <u>Duckworth v. Ford</u>, 995 F.2d 858, 861 (8th Cir. 1993) (concluding that it was clearly established that the employee's opposition to his employer's candidacy and his support of another person's was protected by the First Amendment). We have consistently held that where a law enforcement officer's speech does not adversely affect the workplace, the right to utter such speech is clearly established. <u>See</u> <u>Buzek</u>, 972 F.2d at 997; <u>Powell v. Basham</u>, 921 F.2d 165, 168 (8th Cir. 1990) (per curiam). Here, because Wild fired Nord for engaging in campaign speech having no adverse effect on the sheriff's office, Nord's right to express his speech during the campaign without suffering an adverse employment action was clearly established.

Wild's solicitation of the advice of counsel does not bolster his argument that Nord's rights were not clearly established. While Wild's reliance on counsel's advice

-19-

may be a factor in the qualified immunity analysis, see Kincade, 64 F.3d at 399, the counsel must be properly informed so that the legal parameters can be fully explained, Watertown Equip. Co. v. Norwest Bank Watertown, N.A., 830 F.2d 1487, 1495 (8th Cir. 1987); see also Lindsey, 491 F.3d at 901-02. It is clear that Wild failed to inform counsel that he intended to enforce the "unwritten rule" that a deputy who runs against the sheriff in an election will be fired if the sheriff wins. Counsel admitted that had Wild told her this information, she would have given it more thought and advised accordingly.

## II.

Even if we were to refuse to accept Wild's concession and apply the Pickering/Connick test under the first step of the qualified immunity analysis, a constitutional violation still occurred. The majority makes no decision as to whether all of Nord's campaign statements were matters of public concern but instead concludes that, even if all Nord's speech merits protection, it was reasonable for Wild to believe that the speech would be potentially disruptive to the sheriff's office. We, however, have consistently required evidence demonstrating workplace disruption before the interests of the employee and the employer are balanced. See, e.g., Shockency, 493 F.3d at 949-50; Hall v. Mo. Highway & Transp. Comm'n, 235 F.3d 1065, 1068 (8th Cir. 2000); Burnham v. Ianni, 119 F.3d 668, 678 (8th Cir. 1997) (en banc); Kincade, 64 F.3d at 398; Dunn, 40 F.3d at 293. "Mere allegations [that] the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." Lindsey, 491 F.3d at 900.

As the majority notes, in some situations an employer need not wait for the adverse effects of certain speech to manifest prior to taking an employment action, such as when it is "reasonably believed [the speech] would disrupt the office, undermine his authority, and destroy close working relationships." Connick, 461 U.S. at 154. This is not such case. There is no evidence in the record providing a

reasonable basis for Wild's belief that disruption would occur. In fact, Wild testified that, during the campaign period, there were no complaints about how the office was run nor were there any communication problems between the employees. Moreover, Wild agreed that all the employees acted professionally during the campaign.

Importantly, Nord was fired after the campaign and the election. Accordingly, at the time of Nord's firing, any speech that could potentially disrupt the workplace had already been uttered, and, as evidenced by the record and Wild himself, Nord's campaign speech had not affected the morale nor the professionalism of the employees. Moreover, Wild concedes that he not only fired Nord for his campaign speech, but also fired Nord for running against him. This concession further demonstrates that after the election, Wild's motivation for firing Nord was the so-called "unwritten rule" rather than any potential disruption due to Nord's speech.

"[I]f the defendants have failed to produce evidence weighing against permitting the employee's expressive conduct, or if there is a question of fact as to whether they reasonably believed the conduct to be disruptive, then the defendants are not entitled to qualified immunity." Dunn, 40 F.3d at 293 (citations omitted). Here, there is no evidence of disruption or at most, there is a question of fact as to whether Wild reasonably believed Nord's conduct would be disruptive. Thus, even if we forgo Wild's concession, I would hold that Wild violated Nord's clearly established constitutional right to engage in campaign speech. See Buzek, 972 F.2d at 997.

### III.

I also part with the majority's conclusion that Nord held a confidential position. The majority, in reliance on Hinshaw, determined that the Pickering/Connick test applies rather than the Elrod/Branti exception because this case involves both speech and political affiliation. Although an employee's status as a policymaking or

confidential employee is a factor that weighs in favor of the employer under the balancing prong of the Pickering/Connick test, that test is not at play in this case due to Wild's concession. And, even if applied, Appellants have failed to produce sufficient evidence in order to trigger the balancing test. Thus, whether Nord is a confidential or policymaking employee is of no consequence.

Even if we were to consider Nord's positional status and apply the Elrod/Branti test instead, I find unpersuasive the majority's reliance on a Fourth Circuit case in determining that Nord holds a position of confidence. This court has acknowledged that although "other circuits have determined that deputy sheriffs held policymaking positions and could be transferred for political reasons, . . . these cases are not controlling here because they turned on state law provisions in different jurisdictions." Shockency, 493 F.3d at 950-51. We have to look to the applicable state laws and the actual duties assigned to deputy sheriffs in Walsh County, North Dakota to determine whether political affiliation is essential to Nord's effective performance of his position as deputy sheriff. Id. at 951; Billingsley v. St. Louis Cnty., 70 F.3d 61, 64 (8th Cir. 1995).

Here, Nord's duties included the routine tasks of general police work, prevention and detection of crime, protection of life and property, and the performance of duties as assigned. Nothing in the Walsh County Deputy Sheriff's job description empowers the deputy with any discretionary function nor can it be said, based on this job description, that the deputy sheriff "'performs virtually all the duties attendant to the actual duties of the sheriff himself.'" Horton v. Taylor, 767 F.2d 471, 475 (8th Cir. 1985) (quoting McBee v. Jim Hogg Cnty., Tex., 703 F.2d 834, 839 (5th Cir. 1983), on reh'g, 730 F.2d 1009 (5th Cir. 1984)). Viewing the deputy sheriff and sheriff's relationship in the abstract is insufficient to establish the type of relationship necessary under Elrod/Branti.

Indeed, North Dakota case law acknowledges that "the official acts of a deputy sheriff are the acts of the sheriff." Turnquist v. Kjelbak, 77 N.W.2d 854, 857 (N.D. 1956). This broad statement, however, says nothing about the discretionary functions of a deputy nor whether the deputy handles confidential matters, but rather establishes that the deputy is essentially the sheriff's agent and, thus, the sheriff is responsible for the deputy's acts. As we said in Horton, the "Branti test is a functional one, focusing on the *actual duties* an employee performs." Horton, 767 F.2d at 477 (emphasis added). Thus, the focus should not be on whether an agency exists but on the actual duties assigned within that agency. Here, those duties did not include any assistance in making policies nor did it involve any tasks requiring political loyalty to the sheriff.

"Branti requires that a distinction be drawn between political loyalty and other kinds." Id. at 476. It is one thing to say "that partisan feelings will so affect an employee's work that his effectiveness and efficiency will be influenced," and another that "raw political patronage"alone justifies a dismissal. Id. at 477. Because Nord's position as a deputy was not highly discretionary, policymaking, or confidential and because, as evidenced from the record, Nord's campaign against the sheriff did not adversely affect his effectiveness or efficiency as a deputy— Nord's tasks, at best, involved general police work—Nord was fired simply for running against Wild and not because "party affiliation is an appropriate requirement for the effective performance of [Nord's job]." Branti v. Finkel, 445 U.S. 507, 518 (1980). Accordingly, Nord's dismissal is more akin to a dismissal based on raw political patronage and such dismissals are not enough to satisfy the Elrod/Branti exception. Horton, 767 F.2d at 477. Finally, the fact that Nord may have been an at-will employee does not mean he can be fired in violation of his constitutional rights. O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 725-26 (1996).

## IV.

Nord was fired in violation of his First Amendment rights which were clearly established under the law.  He did not hold a confidential or policymaking position, nor is political affiliation essential to the performance of his duties.  Accordingly, the Appellants have failed to satisfy the elements of the qualified immunity defense.

_____